Filed 9/29/20  In re April F. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re APRIL F., a Person Coming Under the Juvenile Court Law. | B302543 (Los Angeles County  Super. Ct. No. 19CCJP03737A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  REGINA F.,  Defendant and Appellant. | |

APPEAL from orders of the Superior Court for Los Angeles County, Craig Barnes, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

Regina F. (mother) appeals from the jurisdiction and disposition orders of the juvenile court regarding her infant daughter, April F. Mother contends there is insufficient evidence to support the juvenile court's jurisdiction findings under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b), based upon allegations of domestic violence (mother does not challenge the jurisdiction findings based upon marijuana use). She also contends the court's disposition order removing baby April from her custody must be reversed because no substantial evidence supports the court's finding that there were no reasonable means to protect baby April without such removal. We conclude substantial evidence supports both the jurisdiction and disposition orders, and affirm.

## BACKGROUND

A. *Incidents Leading to Filing of Dependency Petition*

On April 15, 2019,[2] the Los Angeles County Department of Children and Family Services (the Department) received a referral, reporting that there had been a domestic violence incident involving mother and Manuel S. (father) on April 13.[3] According to the reporting

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] All events at issue in this case took place in 2019.

[3] There is some confusion about the date the incident took place. Although the reporting party stated that the incident took place on April 13, police call logs show that calls were placed to the police on April 12 and April 13. Mother subsequently said the incident took place on April 11, and that

party, mother said she got home from work at around 2:30 a.m. and went to her mother-in-law's apartment to pick up baby April (her mother-in-law, baby April's paternal grandmother (PGM), lived in the apartment next door to mother and father).[4] Mother brought baby April back to her apartment, fed her, and put her to bed. Mother then went outside to call a friend. Father sent mother several text messages while she was talking with her friend, and when she returned to the apartment, they began to argue. When mother threatened to call the police, father grabbed her phone and kicked and punched her. Father was arrested that day.[5]

A children's social worker (CSW) spoke with mother on April 16. Mother said that she worked in food preparation, working late hours. She confirmed the details that had been reported about the April incident, and provided further details. She said that she got angry when, after she returned to the apartment, father was recording her with his phone and flashed the light from his phone in baby April's eyes. She pushed him away, and he hit her on the ribs with his elbows and kicked her multiple times on her leg. PGM came into their apartment and told father to leave. He did so, but he took mother's

father was arrested on April 12 after PGM called the police because she did not want them to fight. The precise dates are not important to the resolution of this appeal. We will refer to the entire event as the April incident. To avoid confusion, we hereafter refer to the minor as "baby April."

[4]     Baby April was less than three months old at the time of the incident.

[5]     Father was released on April 16; the case was rejected by the District Attorney.

phone with him.  Mother went after father (despite PGM's attempts to keep her inside) and demanded he return her phone, but he said that he had broken it.  Father eventually left for work, and mother called the police.  Shortly thereafter the police arrived.  PGM called father and told him to return home, and he was arrested upon his return.

The CSW asked mother about any past incidents of violence. Mother denied any prior violence, but said that father had accused her of cheating and kicked her out of their home during arguments twice while she was pregnant.  She also said that one time, when she was seven months pregnant, she got angry because father was smoking marijuana while driving.  They argued, and father made her get out of the car at a random place; mother had to get picked up by a friend.  She stayed away for three days, until father reached out to her and apologized, telling her he would stop smoking.  Mother said father stopped for a short while, but started up again.[6]  The CSW created a safety plan with mother that included mother getting a restraining order against father; the CSW also connected mother with an agency that provides domestic violence, counseling, and case management services.

A few days later, the CSW spoke with father about the April incident.  Father said that mother had been leaving the house at odd hours without telling him where she was going.  On the morning in

---

[6]     Because mother does not challenge the jurisdictional findings as they relate to allegations of marijuana use by father and mother, we will not further discuss the facts related to those allegations.

question, he noticed at around 5:00 a.m. that mother was not home and had taken baby April with her. He found them outside, and he and mother got into an argument. They went back inside, where the argument continued. Mother began to record him on her phone, so he began to record her as well. He then took mother's phone and broke it. Mother began hitting him with something she was holding, and he hit her back. His mother (PGM) came into their apartment and separated them. Father went outside, but mother followed him. Father had tools for his work with him, and he dropped them and started to flee when mother looked like she was going to fight with him again. Mother picked up one of his tools and started to pursue him, and eventually began to throw all of his tools around in anger. Father went to work, but returned to his home when PGM called him. Father admitted to the CSW that he should not have acted the way he did, but expressed frustration at the way mother acted.

Although mother filed for and obtained a temporary restraining order against father on April 18 in accordance with the safety plan the CSW developed with her, she did not contact the domestic violence/counseling agency the CSW had arranged for her. Then, on May 16, she and father got into another physical altercation in which the police were called. Both parties reported the incident to the Department, and the CSW arrived on scene shortly thereafter and interviewed both mother and father.

Mother told the CSW that she had moved out of the apartment next door to PGM, but PGM would not let her take baby April with her while she was looking for a place to stay. She said that on May 16, she

went to PGM's home to visit baby April, and father was there; she said she did not know he would be there. They started to argue, and father reached to try to take mother's phone. He grabbed her arm, so mother hit and bit him. The police were called; mother said that after interviewing both parties, the police officers scolded her for hitting father and left. When asked about the restraining order, mother told the CSW it no longer was in effect. She said that she and father went to court together for the hearing on the restraining order, but they did not know they had to check in; when they eventually tried to check in, they were told it was too late.

Father told the CSW that he had moved back into PGM's home about two weeks prior to the incident. Although he knew he was violating the restraining order by doing so, he said he did it because mother asked him to care for baby April, who was living with PGM; mother did not come to the home during those two weeks, until the day of the incident. Father told the CSW that mother was aggressive when she came to PGM's home that day. They got into an argument after mother put her shoes on the couch and he told her she needed to respect the furniture. Mother began to record father on her phone, and told him she was going to get him arrested again. When he approached her to get her to stop recording, she started to flail her arms and legs, kicking him in the head. He grabbed her arms to try to stop her from hitting him, and she bit him really hard, leaving a deep bruise on his arm. He let go of her, and she called the police.

That same day, the CSW interviewed PGM about the incident that took place that day and the April incident. With regard to the April

incident, PGM said that father had come to her home in the early morning hours to ask if she knew where mother was. PGM called mother, who lied about where she was. Later, she heard mother and father arguing next door. She went to their apartment and split them up. When father left the apartment with mother's phone, PGM tried to get mother to stay in the apartment until she calmed down, but mother went out, and she and father had another argument. PGM was not aware that either of them had tried to hit the other.

With regard to the current incident, PGM told the CSW that she allowed father to move into her home because mother told her that the restraining order was not active. She said that mother was always aware that father was living in her home, and she showed a video text message dated the day before (i.e., May 15) showing father and mother sleeping in the same bed together. In the text message, PGM was scolding father and telling him to be more responsible.

A few days later, the CSW interviewed the paternal aunt. Paternal aunt said that she witnessed the incident on May 16. She told the CSW that she had come into the living room of PGM's house and saw father trying to restrain mother while mother was hitting him in the face and arm. She did not see what had started the fight, but said that both mother and father were very immature.

On June 7, the Department sought and obtained a removal order for baby April. The Department detained baby April with PGM on June 11, and filed a dependency petition on June 13. The petition alleged two identical counts based upon the two domestic violence incidents,

one under section 300, subdivision (a) (count a-1), and one under section 300, subdivision (b) (count b-1).[7]

B.      *Investigation in Preparation for Jurisdiction/Disposition Hearing*

In preparation for the jurisdiction/disposition hearing, a dependency investigator (DI) interviewed mother, father, PGM, and paternal aunt regarding the domestic violence incidents. The DI's summary of the interviews is set forth in the Department's jurisdiction/disposition report.

In the DI's interview of mother, mother gave a somewhat different version of the April incident than she had given to the CSW shortly after the incident. She told the DI that on April 11, she and father were arguing about messages father had been getting on his phone, and about mother going outside to talk to her friends on her phone. During the argument, mother got upset because father started recording her and the baby, saying "Here is my woman who goes out at night while

---

[7]      Both counts alleged that father and mother "have a history of engaging in violent verbal and physical altercations in the presence of the child. On 5/16/2019, the father grabbed the mother's arm and the mother sustained redness to the mother's arm. The mother struck and bit the father's arm, inflicting a deep bruise to the father's arm. The mother kicked the father in the head, resulting in the father sustaining redness and swelling to the head. On 4/11/2019, the mother pushed the father and struck the father with an object. The father struck the mother on the ribs with the father's closed fist. The father kicked the mother repeatedly on the mother's leg, inflicting bruises to the mother's legs. The father shoved the mother's left arm. As a result of the incident, the father was arrested. Such violent conduct on the part of the parents endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

my baby is sleeping." Father pushed her, and hit her on her shoulder. She pushed him back, and he starting kicking her on the legs. They were in the bedroom; baby April was sleeping in the room in her crib. PGM came into their apartment, and father left with mother's cell phones; he went to the park across the street. PGM tried to keep mother in the room, but mother said she needed to get her cell phone. She went outside and walked toward father, saying that she wanted her cell phone. Father threw his backpack down, and mother tossed everything out of it, thinking that her cell phone was in it, but it was not. Someone in the park let her borrow a cell phone, and she called the police. (Police call logs show that mother called the police at 6:13 a.m. on April 12 and reported that father had assaulted her.) The next day, mother came home from work and stopped by PGM's apartment to pick up baby April. She and father started to fight again, and PGM called the police. (Police call logs show that PGM called the police at 2:43 a.m. on April 13 to report that mother was harassing and threatening father.) The police came and arrested father.

The account mother gave to the DI of the May 16 incident was mostly consistent with the account she had given the CSW on the day it happened. She told the DI that baby April was in the living room with her and father when the fight happened. Mother also admitted that she kicked father in the face, once, during the fight. Although she had told the CSW that the restraining order was no longer in effect when she went to PGM's home, she told the DI that it was in effect that day, and that father was not supposed to be PGM's home with baby April.

9

In his interview with the DI, father told a very different story about what happened during the April incident. Father said on April 11, he was home with baby April, and mother was not there. He asked PGM to help him look for her. He looked in the parked cars on the street, but she was not there. He believed she was with a woman with whom he believed she was having an affair. He kept calling her on her phone, and she finally answered. He told her not to come home, but 20 minutes later she showed up. He let mother sleep in their apartment, and he went with baby April to his sister's home (it appears she was living with PGM) and slept for a little while. He woke and went to his apartment to get ready to go to work. Mother was on the phone, talking to the woman he believed she had been with, and he got mad. He took mother's phone and broke it, then started to record mother on his phone. Mother threw an empty bottle at him, and "went after [him]." He hit her on the leg around four times (he denied kicking her), but stopped because he knew it was too much. He got ready for work, and PGM talked to mother. When he left, mother ran after him with a knife and one of his tools. Mother called the police, and an arrest warrant was issued for him. He tried to turn himself in later that day, but the police did not arrest him at that time. When he came home, mother broke his phone. PGM called the police, and they came and arrested him.

With regard to the May 16 incident, father told the DI that mother came over to PGM's home because paternal aunt was going to give her a ride to work. She sat down and put her feet on the couch. When father told her to take her feet off the couch and to respect people's property,

mother got mad and started recording him while saying, "Are you going to hit me again?" He grabbed her hand to get her to stop recording, then grabbed her phone and broke it. Mother hit him and kicked him twice in the face.

PGM gave an account of the April incident that mostly was consistent with father's account. She told the DI that father had woken up and found that mother was not there, so he went to PGM's apartment. When mother finally came home, PGM and father asked her where she had been, and she said she had been with her friend. PGM told father that he and the baby should stay with her, so they did. Father got up at 5:30 a.m. and went to his apartment to change for work. PGM went into the apartment after him. Mother was still on the phone, which upset father, and he started to record her and the baby. Mother got upset when father recorded the baby, and went after him. Father broke mother's phone; mother wanted the phone back and started to insult him. PGM locked the door and told mother to calm down. She told father to change his clothes and leave because she did not want them to wake the neighbors. After father left, PGM texted him to ask where mother's phone was, and father texted that he had broken it. Mother saw father's response, ran out of the house, and started chasing father.

PGM said that the following day, mother came to PGM's apartment to get the baby from paternal aunt. While she was there, mother saw father's phone. She took the phone, ran out with it, and broke it with a hammer. Mother and father started to fight again, and

11

PGM called the police because she could not take it anymore. The police came and arrested father.

PGM was not home during the May incident, but she said that after mother moved out she still would come over to PGM's because paternal aunt would give her a ride to work.

Paternal aunt was present only for the May incident. She told the DI that she was cooking in PGM's apartment when mother arrived; mother was going to go to work with paternal aunt. Father was living at PGM's apartment because he was taking care of the baby. While paternal aunt was in the bathroom, she heard father say something to mother about the couch. When she came out, mother was struggling with father, and father was asking mother why she was recording him; father had mother's phone and was holding it up while mother was trying to reach it. Paternal aunt asked what was happening and told them to give her the phone. Paternal aunt gave the phone back to mother, and mother said she was going to call the police; paternal aunt told father to call the CSW. The baby was sleeping in her crib in the room where the incident took place.

In the jurisdiction/disposition report filed in advance of the scheduled jurisdiction/disposition hearing, the Department reported that mother and father indicated their desire to reconcile, although both admitted they needed counseling. The Department recommended that the juvenile court declare baby April a dependent of the juvenile court and remove her from the custody of her parents, and that the parents be ordered to participate in, among other things, drug-testing, a parent

education program and a counseling program to address domestic violence and other issues.

## C.      *Amended Petition and Jurisdiction/Disposition Hearing*

The day before the scheduled jurisdiction/disposition hearing, the Department filed an amended petition that added two more counts under section 300, subdivision (b).  Count b-2 was based upon father's alleged substance abuse, and count b-3 was based upon mother's alleged substance abuse (in both counts, the alleged substance was marijuana).  Due to these new counts, the jurisdiction/disposition hearing was continued.

At the continued hearing, the Department offered into evidence the various reports that had been filed in the case; no other evidence was presented.  Counsel for mother argued that the a-1 count should be dismissed because there was no evidence that baby April was harmed in any way by the incidents between mother and father.  Counsel also stated that the Department had not met its burden with regard to the b-1 count.  The remainder of counsel's argument was directed to the b-3 count, which is not at issue in this appeal.  The juvenile court found there was ample evidence to sustain all three counts against mother (counts a-1, b-1, and b-3).[8]

Moving on to the disposition, the only issue mother's counsel raised related to the Department's recommendation that mother

---

[8]      Because father is not a party to the appeal, we do not discuss the findings made as to him.

participate in a drug program.[9]  Following the argument, the court declared baby April a dependent of the juvenile court, removed her from her parents' custody, and ordered the parents to participate in various services, including domestic violence counseling.

Mother timely filed a notice of appeal from the jurisdiction and disposition orders.

## DISCUSSION

A.   *Jurisdictional Order*

As noted, mother challenges the juvenile court's order finding jurisdiction with regard to counts a-1 and b-1.  Mother first argues that we should address the merits of her challenge, even though she does not challenge the jurisdictional finding as to count b-3, because the jurisdictional finding as to counts a-1 and b-1 provides the basis for the dispositional orders requiring her to complete counseling to address domestic violence issues.  On the merits, mother argues there is no substantial evidence that there is ongoing domestic violence between mother and father or that such violence is likely to continue, and therefore the order finding jurisdiction under those counts should be reversed.  We agree that we should address mother's challenge, but find that substantial evidence supports the juvenile court's findings.

---

[9]     In light of the added counts in the amended petition, the Department filed a last minute information for the court in which the Department, among other things, recommended that both parents be ordered to participate in a drug rehabilitation program.

14

1.    *It is Appropriate to Address Mother's Challenge*

As the Department observes in its respondent's brief (and as mother acknowledges), when the juvenile court finds jurisdiction over a minor on several grounds, the reviewing court can affirm the jurisdictional finding if there is substantial evidence to support any one of those grounds, and it need not consider whether there is evidence to support any of the other grounds. (See, e.g., *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) However, "we may also exercise our discretion to reach the merits of a challenge to any jurisdictional finding when the finding may be prejudicial to the appellant." (*In re D.P.* (2014) 225 Cal.App.4th 898, 902.) In this case, the juvenile court's finding that the domestic violence between mother and father endangers baby April's physical health and safety and places her at risk of serious physical harm has a prejudicial impact on mother because, based upon that finding, she has been ordered to complete individual counseling to address domestic violence issues. Therefore, we will consider mother's challenge to the jurisdictional order as to counts a-1 and b-1.

2.    *Substantial Evidence Supports the Jurisdictional Findings on Counts a-1 and b-1*

"'The basic question under section 300 is whether circumstances at the time of the [jurisdiction] hearing subject the minor to the defined risk of harm.' [Citation.] 'Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300' at the jurisdiction hearing. [Citation.] 'On appeal, the "substantial evidence" test is the appropriate standard of review for

15

both the jurisdictional and dispositional findings. [Citations.]' [Citation.]" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) Under the substantial evidence test, we examine the record in the light most favorable to the juvenile court's findings. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) We do not reweigh the evidence or make credibility determinations; conflicts in the evidence must be resolved in favor of the juvenile court's findings. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) If there is substantial evidence to support the juvenile court's findings, we must affirm. (*Ibid.*)

"Jurisdiction under section 300, subdivision (a) requires proof that the child suffered or is at substantial risk of suffering 'serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.'" (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.) Jurisdiction under section 300, subdivision (b), is found when the juvenile court finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately . . . protect the child." (§ 300, subd. (b)(1).)

Section 300 does not require that the child actually suffer harm before the juvenile court can assume jurisdiction. Under subdivision (a) or (b), it is sufficient if there is a substantial risk that the child will suffer serious physical harm as a result of the parent's actions. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) It is well established domestic violence occurring in the presence of the child presents such a risk and justifies a finding of jurisdiction under section 300, subdivision (a) or subdivision

16

(b) where the domestic violence is ongoing or likely to continue. (See, e.g., *In re T.V.* (2013) 217 Cal.App.4th 126, 134 [jurisdiction found under § 300, subd. (b)]; *In re R.C.* (2012) 210 Cal.App.4th 930, 941-942 [jurisdiction found under § 300, subd. (b)]; *In re E.B.* (2010) 184 Cal.App.4th 568, 575-576 [jurisdiction found under § 300, subd. (b)]; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [jurisdiction found under § 300, subd. (b)]; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600-601 [jurisdiction found under § 300, subd. (a)].)

In this case, mother admits she and father engaged in two separate domestic violence incidents in April and May, but argues the evidence failed to show that the domestic violence was ongoing and likely to continue. We disagree.

The admitted incidents of domestic violence were relatively recent, and there was no indication that either mother or father had done anything to try to prevent further incidents. Although mother obtained a temporary restraining order against father, there was evidence that she knowingly asked father to violate it by moving in with PGM to take care of baby April. In fact, there was evidence that mother told PGM that the restraining order was not in effect in order to convince PGM to let father move in with her. In addition, mother and father violated the restraining order by going together to the court hearing on the permanent restraining order. And, on the day of the hearing on the permanent restraining order, mother and father were discovered sleeping together.

Not only did mother ignore the restraining order, she also failed to contact the domestic violence counseling agency the CSW had arranged,

17

even though she told the CSW that she needed counseling. There is no evidence that she has sought such counseling elsewhere. Given her and father's expressed desire to reconcile, and her failure to seek the recommended counseling, it was reasonable for the juvenile court to conclude that there would be further incidents of domestic violence that put baby April at substantial risk of serious physical harm. "A parent's past conduct is a good predictor of future behavior." (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.) Therefore, the court's jurisdictional findings were supported by substantial evidence.

B.     *Substantial Evidence Supports the Disposition Order Removing Baby April From Mother's Custody*

Mother contends there was no evidence there would be a substantial danger to baby April if she were returned to mother's custody. She also contends the juvenile court failed to consider whether there were reasonable protective measures that could be put in place that would avoid the need to remove baby April from mother's custody. Therefore, she argues the disposition order must be reversed. We disagree.

"Before the [juvenile] court may order a child physically removed from his or her parents, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 145-146, citing § 361, subd. (c)(1).) The child need not have been actually harmed before removal is appropriate. (*Id.* at p. 146.) When reviewing

18

a disposition order, we apply the substantial evidence test, bearing in mind the clear and convincing evidence burden of proof. (*Id.* at p. 146.) The party challenging the disposition order has the burden of showing there is no evidence of a sufficiently substantial nature to support the juvenile court's order. (*Id.* at p. 147.)

Mother contends no clear and convincing evidence showed that baby April would be at substantial risk of harm if she were returned to mother's custody because the juvenile court had entered a permanent restraining order "[a]nd the parents had insight into their case issues and were cooperative and willing to engage in services." But the evidence showed that when the temporary restraining order was in place, mother encouraged father to violate it and told PGM that it no longer was in effect. And, when she was put in contact with domestic violence counseling services, mother failed to follow up and take advantage of them. We find this to be compelling evidence supporting the juvenile court's finding that removal was necessary to protect baby April, and that there were no reasonable means by which she could be protected without removal.

//

//

//

//

//

//

//

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:



MANELLA, P. J.



COLLINS, J.